UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
JEAN HOGUE                                          :               03 Civ. 4963 (SHS)
                              Plaintiff,            :
                                                    :               OPINION & ORDER
            -against-                               :
                                                    :
JO ANNE B. BARNHART,                                :
Commissioner of Social Security,                    :
                                                    :
                              Defendant.            :
-------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

        Plaintiff Jean Hogue brings this action pursuant to section 205(g) of the Social Security

Act (the "Act"), 42 U.S.C. § 405(g) to challenge the final decision of defendant Jo Anne B.

Barnhart, Commissioner of Social Security, denying plaintiffs' claim for Social Security

disability insurance ("SSDI") benefits.  The Commissioner and Hogue have cross-moved for

judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  For the reasons set

forth below, the Commissioner's motion is denied, Hogue's motion is granted, and this case is

remanded for further proceedings.


**BACKGROUND**

**I.      Procedural History**

        Hogue applied for Social Security disability benefits on February 21, 2000, alleging an

inability to work since April 26, 1999.  (R. 67).[1]  The claim was initially denied and Hogue

requested a hearing before an Administrative Law Judge ("ALJ").  (R. 61, 64).  On December 4,

2002, Hogue appeared with counsel at the hearing held before ALJ Kenneth Levin.  (R. 25-29).

After consideration of the case de novo, Judge Levin issued a decision finding Hogue not

---

[1] References to "(R. __)" are to pages of the certified copy of the administrative record of proceedings filed by the
Commissioner as part of her answer.

disabled because she was capable of performing her past relevant work of a social service aide. The Appeals Council denied Hogue's request for review on April 29, 2003, rendering the ALJ's January 22, 2003 decision the final decision. (R. 3-5).

## II. Factual Background

### A. Non-medical Evidence

Hogue, who was fifty-one years old at the time of the hearing, lives with her two adult children. (R. 41, 67). She has a year of college education, (R. 42) and her most recent employment, which she held from July 1994 to April 1999, was as a home health aide. (R. 28, 76). Hogue reported that her job as a home health aide involved assisting patients with dressing and meals, escorting them to appointments, and cleaning. (R. 29, 32, 76). Prior to that, from 1987 to 1991, Hogue worked as a peacekeeper supervisor (referred to by the ALJ as a "social service aide" position) in a family homeless shelter. (R. 29-30, 76). Hogue reported that her activities as a peacekeeper supervisor included writing reports, monitoring the building, and supervising residents. (R. 30-31). Additionally, Hogue reported that the peacekeeper job occasionally involved assisting her co-workers in breaking up fights between residents. (R. 31).

#### 1. Plaintiff's Testimony

At the hearing before Judge Levin, Hogue testified that she stopped working after she injured her back while pushing a wheelchair and started having back spasms. (R. 32). Hogue testified to having pain and stiffness in her lower back on the right side. (R. 33). She reported that the pain does not radiate to other parts of her body. (Id.). She also testified that she suffered daily from heart palpitations and chest pain. (R. 34-35). She referred to the chest pains as "angina pains," and described them as "catches" in her chest that make it feel like she needs to

2

belch. (R. 34). She testified that belching does not relieve the symptom, but that she was taking potassium and other medication to relieve the pain. (R. 35). She testified that she feels the pain under her heart when she is upset or stressed, but that it does not radiate to other parts of her body. (R. 34).

Hogue also testified that she experiences daily asthma attacks. (R. 35). She reported that the asthma causes a tightening in her chest, but also testified that she could not tell the difference between chest pains associated with the asthma and chest pains associated with angina. (R. 35-36). She reported that she uses a nebulizer to treat the pain associated with her asthma. (R. 35). Hogue testified that to treat the attacks she uses her inhaler, and when that does not work, she uses a nebulizer. (R. 36-37). She testified that she uses the nebulizer two to three times a day, for approximately forty-five minutes each time. (R. 37, 56). Hogue testified that she smokes cigarettes, but that she was down to three cigarettes a day. (R. 46).

Hogue also testified that she suffers from sleep apnea, and because the sleep apnea makes her unable to sleep through the night, she falls asleep two or three times during the day for forty-five minutes to one hour, sometimes without realizing that she has fallen asleep. (R. 36-37). To treat the sleep apnea, she uses a continuous positive airway pressure ("CPAP") machine about three times per week, but testified that she could not use it more often because she suffers from panic attacks when she wakes up with the CPAP mask on. (R. 36). In addition, Hogue testified that she suffered from a gynecological problem that results in abnormal bleeding and pain, that she has a peptic ulcer, and that she was once diagnosed with gout. (R. 38, 40). She testified that she takes Nexium for the ulcer, and that it helps provide relief. (R. 39). Finally, she testified to having tendonitis in both shoulders that causes pain and makes it difficult for her to raise her

arms. (R. 39). She testified at the hearing that she was currently experiencing pain in the left shoulder, but that earlier in the year she had been troubled by the right shoulder. (Id.).

With respect to physical limitations, Hogue testified that she could sit for forty-five minutes to one hour at a time before feeling stiffness in her lower back. (R. 39). She reported that she could stand for one hour, and for up to two hours if nothing touches her knee. (R. 40). She testified that she could walk for about an hour before she experiences chest and knee pain. (Id.) Hogue testified that she could lift and carry five or ten pounds. (R. 42). Hogue reported that she does not do any of the cooking, cleaning and other household chores at home. (R. 42). She testified that she generally spends her day watching television, writing, reading and napping, and she goes to church once or twice a month. For exercise, she walks and does home exercises prescribed by her orthopedist. (R. 43-44).

## 2. Vocational Expert's Testimony

Mark Rammauth, a vocational expert who testified at the hearing, stated Hogue's prior work as a home health attendant was classified as medium work, and her work as a peacekeeper supervisor, (referred to by Rammauth as a "social service aide"), was considered "light work." (R. 53-54). [2] He stated that breaking up fights was not an essential part of a social service aide job as it is typically performed. (R. 45). On examination by Hogue's attorney, Rammauth testified that if a person had to use a nebulizer two to three times a day, for thirty-five to forty-five minutes each time, or had to lie down during the day for forty-five minutes to an hour each time, she would not be able to perform her past relevant work or any of the jobs discussed as hypothetically available light work. (R. 56).

---

[2] The Commissioner's regulations define light work as work that requires lifting no more than twenty pounds at a time with frequent lifting and carrying of items weighing up to ten pounds. See 20 C.F.R. § 404.1567(b). A job classified as light work may involve walking or standing, or – if it involves long periods of sitting – it may require some pushing and pulling of arm or leg controls. Id.

### B.     Medical Evidence

#### 1.     Treatment Prior to the Alleged Onset of Disability

Records from Beth Israel Medical Center show that on February 25, 1999, Hogue underwent surgery for the removal of a benign mass from her left breast. (R. 205-20).  Test results prior to surgery showed a normal electrocardiogram ("EKG"), and records reveal that Hogue's asthma and hypertension were stable, and a chest x-ray was negative. (R. 207-213).  A physical examination showed that Hogue's lungs were clear, her heart rhythm was regular, and she had normal musculoskeletal findings. (R. 208).  At a follow-up examination two months later, Hogue's condition stable. (R. 252).

Hogue was examined by her primary physician, Dr. Eduardo Pignanelli, on March 25, 1999.  (R. 249).  Dr. Pignanelli reported that Hogue's blood pressure was at 110/80, and stable on medication.  (Id.).  Her lungs were clear, and her asthma was also stable.  (Id.).  Hogue reported lower back pain, with some radiation to her legs, however, no clear motor or sensory deficits were observed.  (Id.).  Dr. Pignanelli instructed Hogue to obtain magnetic resonance imaging ("MRI") of the lumbrosacral spine.  (Id.).  An MRI taken on April 14, 1999 revealed annular disc bulging with degenerative disc disease at the L5-S1 level of the lumbrosacral spine. (R. 134, 194, 227, 250).  Hogue was examined by Dr. Pignanelli again on April 24, 1999 for hypertension, bronchial asthma and low back pain. (R. 251).  Dr. Pignanelli noted that Hogue continued to complain of low back pain.  (Id.).  He discussed the MRI results with Hogue, and referred her to physical therapy and to an orthopedist.  (Id.).  Dr. Pignanelli diagnosed low back pain syndrome, and recommended Hogue perform only light duty, with no bending or lifting for the next three months.  (R. 89).  During the August 24, 1999 examination, Dr. Pignanelli also

reported Hogue's blood pressure as 150/105, and noted that her asthma was stable. (R. 251).   He

instructed her to comply with her prescribed medication and diet.  (Id.)

### 2.	Medical Treatment During the Relevant Period

### a.  Musculoskeletal Impairments

Following the alleged onset of disability, Hogue received treatment from a variety of

sources for her lower back, left shoulder, right shoulder and right knee.  That treatment is

detailed here.

The first record of treatment subsequent to the alleged onset disability is of an

examination by orthopedist Dr. Ely Bryk at Beth Israel Medical Associates.  (R. 229-31).  On

May 6, 1999, Dr. Bryk reported Hogue's complaints of pain in her lower back and right side.  (R.

226-247).  Dr. Bryk diagnosed lumbar strain with lumbar radiculitis, for which he prescribed

range of motion, strengthening and pain reduction exercises.  (R. 231).  In a note dated June 8,

1999, Dr. Bryk stated that he had diagnosed Hogue with lumbar strain, and that Hogue would not

be able to return to work until July 28, 1999.  (R 235).  In a report dated August 10, 1999, Dr.

Bryk again recommended that plaintiff not work. (R. 238).  In an August 11, 1999 letter, Dr.

Byrk reported that Hogue had been attending physical therapy, but continued to report severe

pain radiating down her right leg.  (R. 239).   Dr. Bryk's examination revealed tenderness in her

right leg, and he requested electromyography ("EMG") testing to determine the extent of nerve

damage.  (Id.).  The report from the EMG test of Hogue's lower extremities, dated August 25,

1999, revealed normal findings, and showed no signs of lumbar radiculopathy. (R. 240-42). A

physical examination revealed that Hogue's lower extremity strength, sensation and reflexes

were normal. (Id.).

On a form dated September 2, 1999, Dr. Bryk reported his primary diagnosis as lumbar radiculitis, and a secondary diagnosis of lumbar strain. (R. 245-46). Dr. Bryk prescribed continued physical therapy. (R. 244). Dr. Bryk noted the negative EMG test results, and reported that upon physical examination, Hogue complained of tenderness on palpitation. (R. 245-46). Dr. Bryk reported that plaintiff's lumbar sprain and lumbar radiculitis had retrogressed, and that plaintiff was "totally disabled" and had an "inability to function in almost all areas." (Id.). Dr. Bryk did not estimate how long the limitations would last, instead noting that a further evaluation was scheduled for October 5, 1999. (Id.) On October 5, 1999, Dr. Bryk reported that Hogue could return to work on November 1, 1999. (R. 91, 247).

Hogue's problem with her left shoulder was first recorded in a report of an August 23 1999, visit to Dr. Pignanelli. (R. 253). During the visit, Hogue reported low back pain and left shoulder pain with decreased range of motion. (Id.). Dr. Pignanelli prescribed Celebrex, and referred Hogue for a shoulder x-ray. (Id.). An x-ray dated October 4, 1999 showed degenerative changes at the acromioclavicular joint but was otherwise normal. (R. 95, 222, 254).

Hogue's left shoulder was examined by Dr. Peter McCann, an orthopedist, on October 7, 1999. (R. 93-95). Dr. McCann's notes indicate that an x-ray of the shoulder was negative, and he reported his diagnosis as left shoulder impingement and possible degenerative joint disease of the acromioclavicular joint. (R. 92-94). Dr. McCann referred Hogue to physical therapy for range of motion and strengthening exercises. (R. 94, 225).

The next record of treatment for the lower back and left shoulder are of an examination by Dr. Pignanelli on April 30, 2001. (R. 259). Dr. Pignanelli reported Hogue's complaints of back pain and difficulty breathing through her nose. (Id.). For her lower back pain and left shoulder impingement, Dr. Pignanelli ordered bone density testing, and again ordered physical

therapy. (Id.). An x-ray of the lumbar spine taken on May 4, 2001 revealed degenerative spurring at multiple levels of the lumbar spine and a slight rightward curvature. (R. 135, 195, 261-62). Bone density testing conducted on June 26, 2001, revealed normal bone density. (R. 264). On March 8, 2002 in an examination by Dr. Pignanelli, Hogue's lower back condition and left shoulder were described as stable. (R. 278).

In 2001, Hogue reported pain in her right shoulder. On June 14, 2001, Hogue was evaluated by orthopedist, Dr. Paul Hobeika. (R. 187-89). Dr. Hobeika noted that Hogue had complained of pain in her right shoulder lasting for two months. (R. 189).[3] Hogue also reported pain in her lower lumbar spine continuing since 1996, with no leg pain. (Id.). However, Dr. Hobeika noted that Houge stated she could walk fifteen to twenty blocks. (R. 187, 189). Dr. Hobeika also noted that Hogue felt stiff in the morning, but that she started feeling better after moving. (R. 189). On examination, Hogue was neurologically intact but had "all the signs of an impingement syndrome of her right shoulder." (Id.). Dr. Hobeika diagnosed Hogue with osteoarthritis of her lumbar spine. (Id.). Dr. Hobeika gave Hogue an injection to treat her shoulder and recommended physical therapy and stretching of her lumbar spine. (Id.).

At a follow-up visit with Dr. Hobeika on December 10, 2001, Hogue reported that the injection had helped with the pain for five months. (R. 191). An MRI of the right shoulder dated December 14, 2001 revealed degenerative arthritic changes in the acromioclavicular joint, and noted a diagnosis of chronic tendonitis with a small partial tear of the supraspinatus tendon. (R. 198).

On July 13, 2001, Hogue was treated in the Columbia Presbyterian Medical Center ("CPMC") emergency room for complaints of right knee pain that had started two days earlier.

---

[3] Hogue's complaint regarding her right shoulder was also documented by pulmonary specialist Dr. C. Redington Barrett, who noted during an evaluation on June 12, 2001 that Hogue had a limited range of motion in her right shoulder and reported a diagnosis of partial frozen right shoulder (R. 273).

(R. 126-32). Hogue reported that she had a history of gout. (R. 127). On examination, the emergency room physician reported that Hogue walked with a limp, but that her right knee had a full range of motion with pain and no signs of effusion or laxity. (Id.). An x-ray of the right knee revealed mild degenerative changes, but no fracture or effusion. (R. 127, 129). The examining physician diagnosed Hogue with right knee pain likely due to arthritis, or possibly gout. (R. 132). Hogue was prescribed medication and a knee brace. (Id.).

Hogue received physical therapy for her lumbar sprain, right shoulder pain and right knee pain from July 2001 through December 2001. (R. 164-70). The reports indicate that Hogue consistently tolerated the treatment well, and indicate generally that she made progress in terms of decreased lower back pain. (Id.).

### b. Other Impairments

Hogue has also received treatment from various sources during the relevant period for hypertension, asthma, sleep apnea, chest pain, and various other problems. That treatment is detailed here.

On August 23, 1999, Dr. Pignanelli reported Hogue's blood pressure at 130/100, and described her lungs as stable. (R. 253). Dr. Pignanelli urged Hogue to comply with her blood pressure medication. (Id.). Hogue returned to Dr. Pignanelli for an examination on January 13, 2000, seeking treatment for a sore throat and cough. (R. 255). On examination, Dr. Pignanelli found that her throat was congested, and she had mild expiratory rhonchi[4] bilaterally. (Id.). Her blood pressure was 130/100. (Id.). Dr. Pignanelli noted that Hogue had lost her insurance. (Id.).

Hogue next visited Dr. Pignanelli on February 15, 2001. (R. 256). Dr. Pignanelli noted that it was the first time he had seen her since January 2000. Hogue reported feeling fine, and

---

[4] Rhonchus is "a continuous sound consisting of a dry, low-pitched, snorelike noise, produced in the throat or bronchial tube due to a partial obstruction such as by secretions." Dorland's Illustrated Medical Dictionary, 1574-75 (29th ed. 2000).

that she wanted to refill her medications.  (Id.).  Dr. Pignanelli reported her blood pressure at 130/80 and that her lungs were clear.  Tests revealed that Hogue's potassium level was low and her cholesterol was elevated.  (R. 257).  Hogue was advised to modify her diet.  (R. 258).  In a subsequent examination on April 30, 2001, Hogue complained of back pain and difficulty breathing through her nose. (R. 259).  Dr. Pignanelli reported that her lungs were clear and her blood pressure was 140/100.  He recommended that plaintiff comply with a low sodium and low fat diet, and ordered a pulmonary and cardio consult.  (Id.).   Hogue visited Dr. Pignanelli again on October 25, 2001, at which time Dr. Pignanelli reported that her blood pressure was "very good" at 110/70.  (R. 274).  Dr. Pignanelli renewed her medications and emphasized her diet. (Id.).  In a March 5, 2002 visit to Dr. Pignanelli, Hogue's blood pressure was 130/90, and her asthma and sleep apnea were stable.  (R. 278).  During her next visit to Dr. Pignanelli on June 18, 2002, Hogue reported feeling better.  (R. 282).  Her blood pressure was 135/80 and her lungs were clear.  (Id.).  Tests showed her cholesterol level was elevated and she was advised to follow a low cholesterol diet. (R. 282-83).   A chest x-ray requested by Dr. Pignanelli, dated August 21, 2002 showed chronic obstructive pulmonary disease.  (R. 305).

On November 23, 2001, a nocturnal polysomnography ("NPSG") test revealed mild obstructive sleep apnea.  (R. 158-59, 275-76).  The testing physician recommended that Hogue use a continuous positive airway pressure titration mask.  (R. 158).  On December 7, 2001, Dr. Robert Lebovics, who treated Hogue for gastroesophogeal reflux disease and sleep apnea, reported on Hogue's physical functioning.  (R. 147-49).  He assessed plaintiff as capable of sitting for four hours continuously, and able to stand or walk continuously for one hour each.  He reported that she was able to lift up to fifty pounds and carry up to twenty pounds.  (R. 147).  Dr. Lebovics opined that Hogue could use her hands for grasping, pushing, pulling and fine

manipulations, and that she was able to bend, squat, climb and reach continuously, but he indicated he could not assess to what degree she could crawl, stoop, crouch or kneel. (R. 148). Dr. Lebovics recommended that Hogue should avoid frequent exposure to noise and occasional exposure to dust, fumes and gases. (R. 149). Dr. Lebovics indicated that there were no objective signs of pain. (Id.). In a handwritten note on the report, Dr. Lebovics noted that Hogue has mild obstructive sleep apnea, and that he had "limited direct knowledge." (Id.).[5]

Hogue was evaluated by Dr. C. Redington Barrett, a pulmonary specialist, on June 12, 2001. (R. 299). In a report dated July 24, 2001, Dr. Barrett described Hogue's history of asthma, which Hogue reported had required several visits to emergency rooms and hospitalizations for wheezing. (Id.). Hogue reported using inhalers and an Albuterol nebulizer to treat the asthma, and that she had undergone a five-day course of Prednisone a few months earlier. (Id.). Hogue also reported that she had been seen in the emergency room for palpitations, shortness of breath and anxiety, and she reported her twenty-five year smoking habit. (Id.). Hogue's then current symptoms included shortness of breath after five blocks, nocturnal wheezing, and coughing. (Id.). Upon examination, Dr. Barrett reported that Hogue's lungs were clear, her heart was not enlarged, and no murmur was audible. (Id.). Her blood pressure was at 130/100. Dr. Barrett noted that pulmonary function studies conducted on June 16, 2001 revealed mild obstructive airways disease responsive to bronchodilators, and a mildly reduced diffusion capacity. (Id.). A chest x-ray done on June 12, 2001 showed only mild, non-specific

---

[5] In a letter addressed to Hogue's counsel dated October 17, 2001, Dr. Daniel Kuriloff wrote that Dr. Lebovics had turned over to him for response a letter seeking information on Hogue's medical treatment that had been originally addressed to Dr. Lebovics because Hogue had been treated by Dr. Kuriloff initially in May 1998 and had been seen again in his office in July 2001. (R. 153). Handwritten notes submitted in response to a subpoena addressed to Dr. Lebovics indicate that Hogue was examined several times between July 2001 and December 2001. (R. 150-161). Dr. Kuriloff reported that in January, Hogue had complained of dysphagia (difficulty in swallowing) for solids, and habitual snoring. (Id.). Dr. Kuriloff's impression was dysphagia, mild "GERD" (gastroesophageal reflux disease), and allergic rhinitis. He noted that sleep apnea was to be ruled out. (R. 151, 153). Because of his limited contact with plaintiff, Dr. Kuriloff declined to offer an assessment of Hogue's functional capabilities. (Id.).

peribroncial cuffing, a finding that Dr. Barrett noted could be seen in asthma patients.  (Id.).

Dr. Barrett reported his diagnosis as bronchial asthma, hypertension, panic disorder with

palpitations, and, as noted above, a partially frozen right shoulder, and prescribed the medication

Flovent.  (Id.).

On December 4, 2001, Dr. Barrett reported that plaintiff's blood pressure was 120/72 and

her lungs were clear.  (R. 301).  Hogue reported that she continued to smoke, and that she wanted

to quit.  (Id.).  Dr. Barrett prescribed a nicotine patch.  (Id.). One month later, on January 9,

2002, Dr. Barrett examined Hogue for complaints of a fever and a productive cough.  (R. 301).

Dr. Barrett reported that Hogue's chest was clear and noted no wheezing.  (Id.).  Hogue's blood

pressure was 110/80 and her heart had a normal rhythm.  Dr. Barrett diagnosed acute bronchitis,

and prescribed Zithromax and Flonase. (Id.).   Hogue was next seen by Dr. Barrett again on June

5, 2002.  (R. 302).  Dr. Barrett's handwritten notes indicate that Hogue reported wheezing and

coughing, and reported using a proventil inhaler and a nebulizer at night when the proventil did

not work.  (Id.).  Hogue also reported that she had run out of nicotine patches and was still

smoking twelve cigarettes a day.  (Id.).   Dr. Barrett reported that Hogue had not been using the

CPAP machine, and had not followed up on sleep studies.  (Id.).  He prescribed an increase in

Flovent.  (Id.).

In August 2002, Hogue was referred to Dr. Barrett again for re-evaluation of pulmonary

studies.  (R. 304).  Dr. Barrett examined plaintiff, finding her blood pressure to be 120/80 and

her chest to be clear.  (R. 304).  He noted that the sleep study conducted on June 23, 2000 was

positive for "OSA" (obstructive sleep apnea).  (Id.).  Dr. Barrett reported that plaintiff had used

the CPAP machine, but complained that the face mask caused panic attacks.  Dr. Barrett's

impression was stable asthma, questionable "COPD" (chronic obstructive pulmonary disease),

sleep apnea, and hypertension. (Id.). Dr. Barrett recommended a pulmonary consultation and a chest scan. (Id.). The scan conducted on September 25, 2002, revealed mild emphysema with air trapping, and two small right lung lower lobe nodules and recommended further evaluation in six months. (R. 306-07).

Dr. Barrett examined Hogue again on October 2, 2002 and reported that she had complained of wheezing for the past two weeks. (R. 308). Dr. Barrett indicated that Hogue's asthma was "poorly controlled." (Id.). He noted that she had been wheezing in the mornings for the past two weeks, and that she was using albuterol several times a day. (Id.). On examination Dr. Barrett reported that her lungs were clear, and he prescribed new medication. (Id.). He also noted the results of the September 25, 2002 chest scan and recommended follow-up in six months. (Id.).

Hogue was examined by cardiologist Dr. Eliscer Guzman in May 2001. (R. 138). Dr. Guzman reported in a May 22, 2001 letter to Dr. Pignanelli that she had examined Hogue for complaints of chest pain. (Id.). The physical examination revealed Hogue's blood pressure to be at 150/90, but Dr. Guzman reported that the rest of the examination was "unremarkable." (Id.). Dr. Guzman noted that an EKG conducted at the time was normal. (Id.). An echocardiogram showed concentric left ventricular hypertrophy with normal functioning. (R. 138, 174-77).

A subsequent EKG ordered by Dr. Guzman, dated March 2002, showed abnormal changes possibly due to myocardial ischemia. (R. 176). A follow-up thallium stress test performed on March 8, 2002 indicated mild to intermediate reversible ischemia. (R. 279). A Holter monitor test conducted in May 2002 revealed an improper heart rhythm and continued hypertension. (R. 178-79).

In a questionnaire dated October 14, 2002, Dr. Guzman reported Hogue's diagnosis as angina pectoris and chronic obstructive pulmonary disease. (R. 309). In regard to Hogue's functioning, Dr. Guzman opined that Hogue could sit for only forty-five minutes continuously, stand and/or walk for five minutes continuously and sit, stand, or walk for only a total of two hours each day. (R. 310-11). Dr. Guzman reported that Hogue could lift and carry less than ten pounds, and was limited in respect to repetitive reaching and handling. (R. 311). Finally, Dr. Guzman reported that Hogue should avoid all exposure to environmental and pulmonary irritants. (R. 312).

During the period when Hogue did not have insurance, she sought treatment at emergency room facilities. On December 16, 1999, Hogue sought treatment at the CPMC emergency room for a fever and cough. (R. 105). Hogue sought treatment at the CPMC emergency room again on March 29, 2000 with complaints of heart palpitations. (R. 106-118). Hogue reported that when she was out shopping, she began to feel her heart "racing," and that she had never experienced that symptom before. (R. 106-107). The examining report notes Hogue's history of smoking. On examination, Hogue's heart rate was reported as in the low 100s and her heart rhythm was described as regular. An electrocardiogram revealed sinus tachycardia[6] but was otherwise normal, and a ventilation perfusion scan of the lungs was normal. (R. 109-118). Hogue was diagnosed with palpitations and a panic attack. At the end of the examination, Hogue reported feeling well, and was discharged with the instruction to return if her symptoms worsened. (R. 118).

On October 25, 2000, Hogue sought treatment at the emergency room of Bladen County Hospital in North Carolina, for a cough, dizziness, weakness, and vomiting blood. (R. 182). The report noted that Hogue smoked one pack of cigarettes per day. (Id.). On examination, plaintiff's

---

[6] Tachycardia refers to "excessive rapidity in the action of the heart." Dorland's, at 1784.

neck was tender, and her heart had a regular rhythm and rate. The examining physician reported hearing rhonchi, but no wheezing. Hogue was diagnosed with bronchitis with a cough, and a history of asthma. (Id.).

On June 23, 2001, Hogue went to the CPMC emergency room with complaints of spitting up blood. (R. 123-25). Hogue was diagnosed with bleeding from her nose and constipation. Her condition on discharge was described as stable. (Id.).

### 3. Consultative Physician's Examination

On July 3, 2001, Hogue was examined by consulting physician, Dr. Howard Finger. (R. 139-46). Hogue reported her history of bronchial asthma and chronic lower back pain that sometimes radiated to below her right knee. (R. 139). Hogue reported having difficulty bending, lifting and carrying, and that she had taken various analgesics to treat her pain and was awaiting physical therapy. (Id.). In connection with her asthma, Hogue reported daily shortness of breath and frequent coughing and wheezing, for which she uses Proventil and Flovent inhalers. Hogue noted that she was sensitive to chemicals and detergents that exacerbate her asthma. (Id.). Hogue also reported that she was scheduled for laser surgery on her right eye to repair a partial tear of the retina. (Id.).

Upon examination, Dr. Finger reported that Hogue's blood pressure was 100/70, and her heart had a regular rhythm with distant heart sounds, and no murmurs or rubs. (R. 140). Hogue's breath sounds were mildly diminished, but were without wheezing. (Id.). Dr. Finger reported that Hogue's straight leg raising was negative to sixty degrees bilaterally, and she was able to flex forward to sixty degrees, with mild to moderate diffused lower back pain. (Id.). Dr. Finger reported no paravertebral muscle spasm, and normal side bending and extension of the lumbrosacral spine. (Id.). He observed that Hogue's gait was slow and moderately stiff, but that

she walked without a cane, and she was able to get on and off the examining table slowly without assistance. (Id.). Dr. Finger reported her flexion in both knees at 150 degrees with full extension in each knee; he noted mild crepitus[7] at the knee but no gross swelling. (Id.). Dr. Finger reported that pulmonary studies suggested mild chest restriction. (R. 140, 142-45), and a chest x-ray was negative. (R. 140, 146). Dr. Finger's impressions were of chronic lower back disorder, and chronic bronchial asthma with mild symptoms and signs. (R. 140). He also noted Hogue's complaints of "floaters" in her eye, apparently due to the tear of her right retina. (Id.). Dr. Finger described Hogue's overall prognosis as "fair." (Id.). In regard to physical functioning, Dr. Finger opined that Hogue was mildly limited in the time she is able to sit, stand and walk, and was mildly to moderately limited in her ability to lift or carry. (R. 140).

### 4. Testifying Medical Expert's Opinion

Dr. Charles Plotz, an internist, reviewed Hogue's medical record and testified at the administrative hearing as a medical expert. (R. 45-53). Dr. Plotz noted Hogue's history of asthmatic bronchitis, and noted that it has been controlled by medication. (R. 46). Dr. Plotz noted that in Dr. Barrett's July 24, 2001 letter to Dr. Pignanelli, that Dr. Barrett had "basically found nothing," only mild obstructive airway disease. (R. 47). He noted that her pulmonary function testing was normal, but that x-rays and an MRI of Hogue's chest revealed mild emphysema. (Id.). Dr. Plotz opined that this was probably related to Hogue's history of smoking. (Id.). Dr. Plotz noted that an MRI of Hogue's lumbar spine showed no disc problems, and an electromyography of the lower extremities was normal. (Id.). Dr. Plotz testified that Hogue has some osteoarthritis of the acromioclavicular joint of the shoulder, and possibly mild impingement syndrome. (Id.). Dr. Plotz noted he was referring to the left shoulder, stating that "[t]he only thing I have is the left shoulder." (Id.).

---

[7] Crepitus is a "crackling sound." Dorland's, at 418.

In regard to Hogue's complaints of angina pains, Dr. Plotz testified that the symptoms Hogue described were likely not cardiac related. (R. 46-47). Dr. Plotz testified that Hogue has a history of esophagitis, and opined that that might explain her chest pains. (Id.). He noted that although tests revealed signs of mild to intermediate reversible ischemia, there were no clear signs in the medical record suggesting angina. (R. 47). Dr. Plotz noted particularly that Hogue was not taking any anginal medication, and that Dr. Hobeika had reported that she could walk "over 20 blocks." (Id.). Dr. Plotz testified that Hogue had borderline hypertension. (Id.).

While Dr. Plotz did not object to the treatment provided by Dr. Guzman, he testified that Dr. Guzman's opinion regarding Hogue's functional capacity was "absurd." (R. 47, 53). Dr. Plotz testified that there was no support for Dr. Guzman's conclusions regarding functioning in Dr. Guzman's own records. (Id.). Dr. Plotz acknowledged that the mild ischemia revealed on the thallium stress test could lead to stress angina, but noted that the medical record did not support a finding of angina. (R. 48). Moreover, Dr. Plotz testified that abnormalities on the thallium stress test would not, without more, indicate functional limitations. (Id.).

As for Hogue's physical limitations, Dr. Plotz opined that Hogue could perform light work. (R. 48-49). Specifically, Dr. Plotz testified that Hogue could sit without limitation. He testified that she could stand and walk for between four and six hours per day, clarifying on follow up that it would be closer to six hours per day. (Id.). He further testified that Hogue could lift and carry up to twenty pounds, but would have some difficulty reaching overhead. (Id.). Dr. Plotz testified that in light of her asthma, Hogue should avoid airborne pathogens. (R. 49). Dr. Plotz testified that her shoulder pain – which he described as alternating from one shoulder to another – should not limit her other than sometimes restricting her ability to reach overhead. (Id.). Dr. Plotz disagreed with the assessment of Dr. Lebovics that Hogue could stand or walk

continuously for only one hour, noting that nothing in Dr. Lebovics' notes, which reported mild gastroesophageal reflux disease with some dysphagia,[8] would indicate any restrictions on standing or walking. (R. 50). Dr. Lebovics had also treated Hogue for sleep apnea, and Dr. Plotz testified that while "severe" sleep apnea might result in non-exertional limitations, there was no indication of severe sleep apnea in the record. (R. 53).

**DISCUSSION**

**I.      Standard of Review**

This Court may reverse the Commissioner's decision "only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Carter, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g)); accord Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); accord Shaw, 221 F.3d at 131; Rosa, 168 F.3d at 77.

In determining whether substantial evidence supports the Commissioner's decision, "the Court [must] carefully consider[] the whole record, examining evidence from both sides." Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (citing Quinones v. Carter, 117 F.3d 29, 33 (2d Cir. 1997). However, it "'may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991) (quoting Valente v. Sec'y of Health and Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984); accord Rosa, 168 F.3d at 77 If the Court finds substantial evidence

---

[8] Dysphagia is defined as "difficulty in swallowing." Dorland's, at 556.

supporting the Commissioner's decision, the decision will be upheld even if there is also

substantial evidence supporting plaintiff's claim.  See DeChirico v. Callahan, 134 F.3d 1177 (2d

Cir.1998); Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir.1990).

## II.      The Definition of Disability

A person is disabled for purposes of the Social Security Act when she is unable "to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment . . . which has lasted or can be expected to last for a continuous period of not

less than 12 months." 42 U.S.C. § 423(d)(1)(A); Rosa, 168 F.3d at 77.  The impairment must be

demonstrated "by medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C.

§ 423(d)(3), and must be "of such severity that [the claimant] is not only unable to do h[er]

previous work but cannot, considering h[er] age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §

423(d)(2)(A).

The Commissioner has established a five-step sequential analysis for considering

disability claims, see 20 C.F.R. §§ 404.1520, 416.920, which the Second Circuit has articulated

as follows:

1.  The Commissioner considers whether the claimant is currently engaged in
    substantial gainful activity.

2.  If not, the Commissioner considers whether the claimant has a 'severe
    impairment' which limits his or her mental or physical ability to do basic
    work activities.

3.  If the claimant has a 'severe impairment,' the Commissioner must ask
    whether, based solely on medical evidence, claimant has an impairment listed
    in Appendix 1 of the regulations. If the claimant has one of these enumerated
    impairments, the Commissioner will automatically consider him disabled,
    without considering vocational factors such as age, education, and work
    experience.

4. If the impairment is not 'listed' in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

Shaw, 221 F.3d at 132 (citing DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir.1998)).

The claimant bears the burden of proof on the first four steps; only if the claimant meets her burden in showing she cannot perform her past work does the burden then shift to the Commissioner on the fifth step to demonstrate that there is alternative substantial gainful work in the national economy that the claimant can perform. Id. If a claimant has multiple impairments, the Commissioner "must evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe." Dixon v. Shalala, 54 F.3d 1019, 1031 (2d Cir. 1995).

**III.    Administrative Law Judge's Decision**

In his written decision, the ALJ followed the above five-step evaluation process in determining whether Hogue was disabled. The ALJ first determined that Hogue had not worked since the alleged onset of disability. (R. 17). He next found that she suffered from a combination of "severe" impairments, including mild controlled hypertension, mild controlled asthma, mild degenerative changes of both shoulders, and chronic lumbrosacral strain. However, the ALJ found that these impairments did not meet or equal one of the listed impairments in Appendix 1 of 20 C.F.R. Part 404, Subpart P. (Id.). The ALJ was then required "to determine whether [Hogue] has the residual functional capacity to perform work she had done in the past." Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995).

Based on the record evidence, the ALJ found that Hogue had the capacity to lift up to 20 pounds, stand or walk for up to six hours with customary rest periods, and an unlimited capacity to sit. (R. 17). The ALJ also found that Hogue was required to avoid exposure to substantial environmental irritants. (Id.). Finding that Hogue's past relevant work as a social service aide did not require performance of activities precluded by Hogue's residual functional capacity, the ALJ concluded that Hogue had not met her burden of establishing that she was unable to perform her past relevant work, and thus she was not disabled for purposes of the Act at any time from the alleged onset of disability through the date of the decision. (R. 18). Because he found that Hogue was not disabled, the ALJ did not evaluate under step five of the analysis whether there was other work which she could perform.

In reaching his conclusions regarding Hogue's functional capacity, the ALJ credited the testimony of the testifying expert, Dr. Plotz. (R. 16). The ALJ noted that among Hogue's treating physicians, only Dr. Guzman and Dr. Lebovics had commented on Hogue's functional limitations. (Id.). The ALJ found that neither of those assessments were supported by the record. The ALJ explained that Dr. Guzman's assessment of total disability was premised on the assumption that Hogue suffers from angina, but the ALJ concluded based on Dr. Plotz's testimony and other record evidence that Hogue did not have angina, and that the mild ischemia revealed in the records would not cause further functional limitation beyond what Dr. Plotz described. (Id.). The ALJ discounted Dr. Lebovics' rating of Hogue's standing and walking limitations, noting that Dr. Lebovics' knowledge of Hogue's condition was limited, and that the limitations were not related to the conditions of GERD and dysphagia for which Dr. Lebovics had treated Hogue. (Id.).

The ALJ found that neither Hogue's musculoskeletal problems, nor her mild asthma would restrict her from performing light work. (R.16). The ALJ found that Hogue's testimony regarding her limitations was not entirely credible, and he concluded that the record did not support Hogue's claimed restrictions due to her sleep apnea. (R. 17).

Hogue contends that the ALJ failed to apply the correct legal standards in weighing the opinions of the various medical sources and improperly failed to seek additional information before discounting the opinions of her treating physicians. Hogue also argues that the ALJ's decision is not supported by substantial evidence. The Court addresses each argument in turn.

## IV.    The Treating Physician Rule

Hogue claims that the ALJ applied an incorrect legal standard in rejecting the opinions of her treating physicians, Drs. Lebovics and Guzman, and instead crediting the opinion of the non-examining physician, Dr. Plotz.

The Commissioner has promulgated regulations providing that the opinion of a claimant's treating physician will be given controlling weight where it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998). However, the general rule requiring deference to a treating physician's opinion does not apply where "the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); accord Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002). Thus, the rule "permit[s] the opinions of nonexamining sources to override treating sources' opinions, provided they are supported by evidence in the record."

Schisler v. Sullivan, 3 F.3d 563, 568-69 (2d Cir. 1994)("Schisler III"); Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995).

Where an ALJ does not give controlling weight to a treating physician's opinion, he must consider the following factors to determine how much weight to give the opinion: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Schaal, 134 F.3d at 503-04; see 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). The ALJ's written decision must include "'good reasons'" for the weight given the treating physician's opinion. Schaal, 134 F.3d at 503-04 (quoting 20 C.F.R. § 404.1527(d)(2)); accord Halloran, 362 F.3d at 32.

### A.      Opinions of Hogue's Treating Physicians

The ALJ properly considered the factors set forth in the regulations in refusing to give controlling weight to Dr. Guzman's opinion regarding Hogue's functional limitations. The ALJ reflected that Dr. Guzman had seen Hogue on only two occasions, and had apparently not done a physical examination or recorded Hogue's subjective complaints. (R. 14). The ALJ determined that Dr. Guzman's opinion was predicated on the assumption that Hogue has angina, but he concluded that was not supported by the record. (R. 16). The ALJ considered the results of tests ordered by Dr. Guzman, including one electrocardiogram that was normal, another electrocardiogram that showed possible ischemia, a myocardial perfusion study that showed mild to intermediate reversible ischemia, and a Holter monitor that appeared normal. However, the ALJ credited the opinion of Dr. Plotz who testified that neither Dr. Guzman's diagnosis of angina nor Guzman's assessment of Hogue's functional limitations was supported by the medical evidence. (Id.). Dr. Plotz noted that although there was evidence of mild ischemia in the test

results, Hogue had not been prescribed any anginal medication, and her subjective description of the chest pains did not comport with pains of an anginal nature.  (R. 16, 47).  Dr. Plotz further testified that the mild ischemia indicated by the test results would not cause the physical limitations reported by Dr. Guzman.  (Id.).

Moreover, Hogue's own testimony provided further evidence supporting the ALJ's rejection of Dr. Guzman's conclusions regarding her functional limitations.  While Dr. Guzman opined that Hogue was unable to walk or stand for more than five minutes at a time, (R. 310), Hogue testified that she walked for exercise and was able to stand for up to two hours and walk for up to an hour. (R. 40).  She had previously reported to Dr. Hobeika that she could walk for up to twenty blocks.  (R. 187, 189).

After considering the relevant factors in determining whether to give controlling weight to Dr. Guzman's opinion, it was not error for the ALJ to resolve an apparent conflict in the medical opinions of Drs. Guzman and Plotz in favor of Dr. Plotz's reading of the medical evidence.  See Aponte, 728 F.2d at 591 (citing Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)) ("genuine conflicts in the medical evidence," are appropriately resolved by the ALJ); accord Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002).

Hogue contends that the ALJ further erred in rejecting the opinion of Dr. Lebovics who reported that Hogue could stand or walk for only one hour continuously.  However, here again, the ALJ considered the relevant factors and gave reasons for deciding not to give controlling weight to Dr. Lebovics' opinion regarding Hogue's ability to walk or stand.  The ALJ considered the fact that Dr. Lebovics had had limited contact with Hogue, and in a very limited area of her medical complaints.  (R. 16).   The ALJ also relied on Dr. Plotz's medical opinion that there was no support in Dr. Lebovics' treatment notes for the functional limitations that he reported, and

the conditions he treated her for had no relation to her capacity for walking or standing. (Id.). Dr. Lebovics himself indicated on the functional assessment form that he had only "limited direct knowledge" of Hogue's functioning. (R. 149). Thus, the ALJ had good reason for not giving his opinion regarding her ability to stand or walk controlling weight.

The ALJ did not specify what weight he otherwise gave to Dr. Lebovics' opinion, but the Court notes that the ALJ's remaining conclusions regarding Hogue's residual functional capacity were otherwise consistent with the opinion of Dr. Lebovics who similarly opined that Hogue was able to lift or carry up to twenty pounds, and should avoid exposure to environmental irritants. (R. 147). Moreover, while Dr. Lebovics opined that Hogue was limited to one hour of continuous walking or standing, he did not indicate how many hours total she would be able to stand or walk in a given day. (Id.). The ALJ described Hogue as being able to stand or walk for up to six hours with customary rest periods. (R. 17)

**B.      The ALJ's Duty to Develop the Record**

Hogue argues, alternatively, that the ALJ should have sought further information and explanation from Drs. Guzman and Lebovics before rejecting their assessments of her physical restrictions.

Hogue correctly urges that an "ALJ generally has an affirmative obligation to develop the administrative record," Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) (citing Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982)), and remand is appropriate where an ALJ fails to seek further information in spite of the existence of gaps or deficiencies in the administrative record. See Rosa, 168 F.3d at 76. Thus, if records from a treating physician cover only a small number of the total visits by the plaintiff to that physician, see Id., or if a

treating physician fails to explain the basis for her opinion, remand may be appropriate.  See

Clark v. Comm'r of Social Security, 143 F.3d 115, 118 (2d Cir. 1998).

Here, however, the ALJ did not err in failing to request further information from Dr.

Guzman or Dr. Lebovics.  There is no indication of any gap in the records provided by Dr.

Guzman or Dr. Lebovics, both of whom had limited contact with Hogue.  Moreover, the ALJ did

not reject Dr. Guzman's opinion for failure to explain his reasoning; rather, he rejected it based

on the medical opinion of Dr. Plotz who reviewed the relevant medical evidence and disagreed

with Dr. Guzman's assessment of functional capacity and with Dr. Lebovics' opinion regarding

Hogue's capacity for continuous standing or walking.  (R. 16).  An ALJ need not seek further

explanation from treating physicians each time there is an inconsistency in medical opinions. See

Rebull v. Massanari, 240 F. Supp. 2d 265, 273 (S.D.N.Y. 2002).  As the court in Rebull noted,

the ALJ's function of resolving conflicts in the medical record, "would be rendered nugatory if,

whenever a treating physician's stated opinion is found to be unsupported by the record, the ALJ

were required to summon that physician to conform his opinion to the evidence." Id.

  **C.**  **Opinion of the Testifying Expert**

Hogue also challenges the weight given to Dr. Plotz's opinion, urging that the ALJ

should not have given Dr. Plotz's opinion greater weight than the opinions of her treating

physicians because he had never examined her and his testimony was incomplete and contained

inherent contradictions.  However, as noted above, the regulations allow "the opinions of

nonexamining sources to override treating sources' opinions, provided they are supported by

evidence in the record." Schisler v. Sullivan, 3 F.3d 563, 568-69 (2d Cir. 1994) ("Schisler III");

see also Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995).

A review of the record reveals that Dr. Plotz's opinion regarding Hogue's residual functional capacity – with which the ALJ agreed entirely – was supported by substantial evidence. Reports from Drs. Bryk and Finger support the conclusion that Hogue has the functional capacity to return to work, and is only mildly limited by her impairments, a conclusion that is consistent with Dr. Plotz's opinion.

Although Dr. Bryk - who diagnosed Hogue with lumbar strain with lumbar radiculitis - reported in September 1999 that Hogue's condition had retrogressed, and that she was "totally disabled," (R. 245-46), by October 1999, Dr. Bryk reported that Hogue could return to work on November 1, 1999. (R. 91, 247).[9] Also, an August 1999 EMG of Hogue's lower extremities ordered by Dr. Bryk revealed normal findings, and showed no signs of lumbar radiculopathy. (R. 240-42). Reports from the physical therapist also indicate that Hogue's lower back problem was progressing with treatment. (R. 164-70).

Noting Hogue's chronic lower back disorder, and chronic bronchial asthma with mild symptoms and signs, Dr. Finger described Hogue's overall prognosis as "fair," and opined that Hogue was only mildly limited in the time she is able to sit, stand and walk, and was mildly to moderately limited in her ability to lift or carry. (R. 139-140).[10]

---

[9] Hogue challenges the ALJ's reliance Dr. Bryk's report regarding her ability to return to work in November 1999, suggesting that all of Dr. Bryk's notes are consistent in stating that plaintiff could not return to work for approximately one month subsequent to his evaluations. In fact, however, the record includes at least two reports from Dr. Bryk that recommend Hogue not work, without setting a date by which he expects she would be able to return to work. (R. 238, 245-46).

[10] Hogue contends that the ALJ should not have credited the assessment of Dr. Finger because it was impermissibly vague. Hogue urges that the Second Circuit's decision in Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000), establishes that a consulting physician's "vague" opinion describing a claimant's condition as mildly limited cannot provide substantial evidence to support particular functional limitations. In Curry, however, the vague opinion of the consulting physician was "[t]he only evidence supporting the ALJ's conclusion" regarding residual functional capacity. Curry, 209 F.3d at 123. In contrast, here, the ALJ also relied on Dr. Plotz's specific assessment of Hogue's functional capacity, as well as reports from Dr. Bryk and Dr. Hobeika, in reaching his ultimate conclusion regarding her residual functional capacity. (R. 14-16).

Also, while the record does reveal signs of impingement syndrome in both shoulders, (R. 92-94, 198), that is not inconsistent with the ALJ's decision. He noted that Hogue "does have some degenerative disease in each shoulder," but concluded based on the evidence that it was mild. (R. 16). He agreed with Dr. Plotz that she may occasionally have difficulty reaching overhead. (Id.). This conclusion is supported by a report from Dr. Hobeika that indicates that Hogue's right shoulder pain was treated with medication, (R. 191), and by Dr. Pignanelli's notes from March 2002 that described Hogue's lower back condition and left shoulder as stable. (R. 278).

The only record of an impairment in Hogue's right knee is in the report from her visit to the emergency room in July 2001. At that time, an x-ray revealed mild degenerative changes, but no fracture or effusion. (R. 127, 129). Shortly before that visit to the emergency room, Dr. Finger had examined Hogue and reported that she had full extension in both knees, and noted mild crepitus, but no gross swelling. (R. 140).

Thus, substantial evidence supports the conclusion that Hogue's musculoskeletal impairments would not cause further functional limitations.

Substantial evidence also supports the conclusion that Hogue's other impairments did not cause further restrictions on Hogue's functional capacity. While the record reveals one incident of Hogue being treated for heart palpitations and a panic attack, during the examination, Hogue's heart rate was reported as in the low 100s and her heart rhythm was described as regular. (R. 109-118). Moreover, Dr. Pignanelli's reports show that Hogue's blood pressure readings were generally stable. (R. 253, 255, 256, 274, 282).

Hogue does have a well documented history of bronchial asthma; however, the record supports the conclusion that it is treated with medication. An August 2002 chest x-ray did show

chronic obstructive pulmonary disease, (R. 305), and a scan conducted on September 25, 2002, revealed mild emphysema with air trapping, and two small right lung lower lobe nodules and recommended further evaluation in six months. (R. 306-07). Additionally, Dr. Barrett's handwritten notes in 2002 describe her asthma as "poorly controlled." (R. 302, 308). However, Dr. Barrett's and Dr. Pignanelli's notes regularly describe Hogue's lungs as "clear." (R. 253, 255, 256, 274, 282, 299, 301, 308), and Dr. Barrett's notes indicate that Hogue was using her inhaler and nebulizer as necessary to treat her asthma. (R. 301, 302, 308).

Finally, although Hogue's testimony at the hearing contradicted the ALJ's findings and Dr. Plotz's conclusions, the ALJ did not err in discounting Hogue's subjective complaints of knee and chest pain that she claimed limited her ability to walk and stand continuously. In discrediting Hogue's claims, the ALJ noted that Hogue paused before answering questions pertaining to her symptoms, but answered promptly and easily when asked "simpler or less 'freighted' questions." (R. 13). The ALJ did not discount Hogue's testimony entirely, as he relied on her testimony that she could walk for up to an hour as support for his decision to reject Dr. Guzman's functional assessments. "'It is clearly the function of the Secretary, not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant,'" Aponte v. Sec'y of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (quoting Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir.1982)), and if the "findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." Id. (citations omitted). Thus, courts note that the ALJ's determination as to the credibility of a claimant's subjective complaints must be accepted "unless it is clearly erroneous." See e.g., Arreaga v. Barnhart, No. 01 Civ. 4051, 2002 WL 31526546, at *9 (S.D.N.Y. Nov. 14, 2002) (citing Aponte, 728 F.2d at

591); Centano v. Apfel, 73 F. Supp. 2d 333, 338 (S.D.N.Y. 1999) (same). As discussed above, there was substantial evidence supporting the ALJ's findings, and the ALJ's conclusions regarding Hogue's credibility are not clearly erroneous.

Because there was substantial evidence supporting Dr. Plotz's opinion regarding Hogue's residual functioning capacity, the ALJ did not err in accepting Dr. Plotz's opinion over that offered by the treating physicians. See Schisler, 3 F.3d at 568-69; Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004).

## V.    Substantial Evidence

### A.    Exertional Limitations

Hogue contends that the decision was not based on substantial evidence because the ALJ relied on Dr. Plotz's testimony, and Dr. Plotz failed to consider the entire medical record. This argument is unavailing, however, because while the ALJ relied heavily on Dr. Plotz's opinion, his decision reveals that he also independently considered the medical records and other testimony provided at the hearing in making his findings. (R. 14-16). Moreover, as the Court addressed in detail above, there is substantial evidence in the record to support Dr. Plotz's conclusions regarding Hogue's exertional limitations, with which the ALJ agreed entirely.

### B.    Non-exertional Limitations

Hogue raises a more difficult question as to whether substantial evidence supported the ALJ's conclusion that her asthmatic condition caused no non-exertional limitations that would preclude her from performing her past relevant work. Hogue contends that because neither the ALJ nor Dr. Plotz commented upon or discounted her allegations regarding non-exertional limitations attributable to her sleep apnea and the daily use of her nebulizer, there was no basis on which the ALJ could determine that she could perform her past relevant work.

Hogue testified at the hearing that she had to use her nebulizer two to three times a day, for periods of 35-45 minutes each to treat her asthma, and that she fell asleep two to three times a day due to her sleep apnea. Hogue urges that when these non-exertional impairments are factored in, the vocational expert's testimony establishes that she could not perform her past relevant work. She notes that vocational expert Rammauth testified that if a person had to lie down two to three times per day, or use a nebulizer two to three times per day for approximately 45 minutes, she would not be able to perform any of the light work discussed as work hypothetically available to Hogue. (R. 56).

As noted above, it is clearly the function of the ALJ to make credibility findings concerning the claimant, and those findings must be accepted where they are not clearly erroneous. See Aponte, 728 F.2d at 591 (2d Cir. 1984); accord Tejada v. Apfel, 167 F.3d 770, 775-76 (2d Cir. 1999). Where an ALJ rejects a claimant's subjective complaints, however, he must set forth the reasons with "'sufficient specificity to enable [the district court] to decide whether the determination is supported by substantial evidence.'" Toro v. Chater, 937 F. Supp. 1083, 1086 (S.D.N.Y. 1996) (quoting Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1987)); accord Rosato v. Barnhart, 352 F. Supp. 2d 386, 398 (E.D.N.Y. 2005).

Contrary to Hogue's claim, the ALJ did expressly find that Hogue's "alleged substantial restrictions from sleep apnea," were not credible, (R. 17), and that finding is supported by substantial evidence. In 2001, the nocturnal polysomnography test revealed mild obstructive sleep apnea, (R. 158-59, 275-76), and in March 2002, Dr. Pignanelli described her sleep apnea as "stable." (R. 278). Upon review of the medical record, Dr. Plotz acknowledged that while "severe" sleep apnea might result in non-exertional limitations, there was no indication of severe sleep apnea in the record. (R. 53). While Hogue testified that she was unable to use the CPAP

mask to treat the condition as often as was recommended, Dr. Barrett's notes indicate, consistent with her testimony, that she was able to use it on occasion. (R. 304). Because the ALJ's decision to discount Hogue's testimony regarding limitations caused by sleep apnea was supported by substantial evidence, and not clearly erroneous, it must be accepted by this Court. See Aponte, 728 F.2d at 591.

In contrast to the ALJ's express finding regarding Hogue's claimed limitations due to sleep apnea, the decision is absent of any direct finding regarding Hogue's testimony that daily nebulizer treatments are required to treat her asthma. The ALJ did describe Hogue's asthma as "very mild and seldom active," and found that it would "[c]ertainly," not cause further limitations, other than limiting her from exposure to environmental irritants. (R. 16). As noted, the ALJ relied heavily on Dr. Plotz's opinion of Hogue's functioning capacity in reaching his conclusions. While Dr. Plotz noted Hogue's history of asthmatic bronchitis, and noted that it has been controlled by medication, (R. 46), he did not comment on whether or not the use of the nebulizer was an essential part of Hogue's asthma treatment.

Hogue urges that the record does not reflect that either the ALJ or Dr. Plotz considered the more recent reports from her pulmonary specialist, Dr. Barrett, that suggest a worsening of her asthma condition. Dr. Plotz did note that in a July 2001 letter to Dr. Pignanelli, Dr. Barrett had "basically found nothing," only mild obstructive airway disease. (R. 47). The ALJ notes in the decision that Dr. Barrett's reports reflect treatment through 2002, (R. 15); however, there was no discussion of the findings in Dr. Barrett's more recent reports, either in the testimony or in the ALJ's written decision.

Hogue's use of her nebulizer was reflected in the first report from Dr. Barrett, (R. 299), and while his October 2002 report described her lungs as clear, he noted that Hogue had been

wheezing in the mornings for the past two weeks, and that she was using albuterol several times a day, and he recommended a follow-up in six months. (Id.). There was no indication from either Dr. Barrett or Dr. Pignanelli that use of the nebulizer was not required to adequately treat Hogue's asthma.

Assuming that the ALJ did consider and reject Hogue's claim regarding the need for daily nebulizer treatments, the decision fails to set forth with sufficient specificity the basis for rejecting that claim. After an independent review of the record, and particularly in light of the medical reports from Dr. Barrett that appear to support Hogue's claimed non-exertional limitation, the Court cannot conclude that substantial evidence supports the ALJ's decision to discount Hogue's testimony regarding limitations caused by her asthma.

Thus, this case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) to evaluate the credibility of Hogue's claim that her necessary asthma treatments impose non-exertional limitations that preclude her from performing her past relevant work.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied, and Hogue's motion for judgment on the pleadings is granted. The final decision of the Commissioner is vacated and this case is remanded to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g), for further administrative proceedings in accordance with this order.

Dated: New York, New York
     May 3, 2005

SO ORDERED:

Sidney H. Stein, U.S.D.J.